State of Maryland v. Juan Carlos Sanmartin Prado, No. 100, September Term, 2015

**PLEA OF NOT GUILTY BY WAY OF AN AGREED STATEMENT OF FACTS – IMMIGRATION CONSEQUENCES – DEPORTATION – <u>PADILLA V. KENTUCKY</u>, 559 U.S. 356 (2010) – INEFFECTIVE ASSISTANCE OF COUNSEL – CONSTITUTIONALLY DEFICIENT PERFORMANCE –** Court of Appeals held that, where the coram nobis court found that defense counsel advised the defendant that "this was a 'deportable offense' and [the defendant] 'could be deported . . . if the federal government chose to initiate deportation proceedings,' and it was 'possible' that the [defendant] would be deported[,]" and where defense counsel testified that he also advised the defendant that "there could and probably would be immigration consequences" and "that it was a deportable or a possibly deportable offense," and the advice was given before a plea of not guilty by way of an agreed statement of facts proceeding, such advice was not constitutionally deficient, but rather was "correct advice" about the "risk of deportation," as required by <u>Padilla v. Kentucky</u>, 559 U.S. 356, 369, 374 (2010).

IN THE COURT OF APPEALS

OF MARYLAND

No. 100

September Term, 2015

_____

STATE OF MARYLAND

v.

JUAN CARLOS SANMARTIN PRADO

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F. (Retired,
Specially Assigned)
Battaglia, Lynne A. (Retired,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: July 11, 2016

In Padilla v. Kentucky, 559 U.S. 356, 374, 369 (2010), the Supreme Court held for the first time that, pursuant to the Sixth Amendment right to counsel, "counsel must inform [his or] her client whether his [or her] plea carries a risk of deportation[,]" and that, "when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear." After Padilla, in Denisyuk v. State, 422 Md. 462, 466, 30 A.3d 914, 916 (2011), this Court held, in relevant part, that "defense counsel's failure to advise [the defendant] of the deportation consequence of his guilty plea was constitutionally deficient[,]" and that, "based on the record developed at the postconviction hearing and the [postconviction] court's express finding on the subject, [] counsel's deficient performance prejudiced [the defendant]." Additionally, in the wake of Padilla, courts in other jurisdictions have held that a defendant's counsel's performance was constitutionally deficient where the defendant's counsel either failed to advise the defendant whatsoever of the immigration consequences of the defendant's guilty plea, or affirmatively misadvised the defendant about the immigration consequences of the defendant's guilty plea. Murkier, however, are the waters where a defendant's counsel advises that an offense is deportable and uses "qualifying" words—such as "very likely be deported," Chacon v. State, 409 S.W.3d 529, 532 (Mo. Ct. App. 2013) (emphasis omitted), or "strong chance" of being deported, State v. Shata, 868 N.W.2d 93, 96 (Wis. 2015)—when advising a defendant of the immigration consequences attendant to a plea.

In this case, we must decide whether defense counsel's advice—that there "could and probably would be immigration consequences" for the defendant's conviction for second-degree child abuse because it was a "deportable" or "possibly deportable"

offense—was constitutionally deficient because defense counsel "qualified" his advice, or was correct advice that adequately informed the defendant of the risk of deportation. We hold that, where the coram nobis court found that defense counsel advised the defendant that "this was a 'deportable offense' and [the defendant] 'could be deported . . . if the federal government chose to initiate deportation proceedings,' and it was 'possible' that the [defendant] would be deported[,]" and where defense counsel testified that he also advised the defendant that "there could and probably would be immigration consequences" and "that it was a deportable or a possibly deportable offense," and the advice was given before a plea of not guilty by way of an agreed statement of facts proceeding, such advice was not constitutionally deficient, but rather was "correct advice" about the "risk of deportation," as required by Padilla, 559 U.S. at 369, 374.

**BACKGROUND**

On June 8, 2010, Juan Carlos Sanmartin Prado ("Sanmartin Prado"), Respondent, a citizen of Ecuador and a legal permanent resident of the United States, was charged by criminal information filed in the Circuit Court for Baltimore County ("the circuit court") with first-degree child abuse causing severe physical injury, second-degree child abuse, and second-degree assault against his three-year-old daughter. On January 6, 2011, Sanmartin Prado pleaded not guilty by way of an agreed statement of facts to Count 2,

second-degree child abuse,[1] pursuant to an agreement with the State.[2]  At that time, Sanmartin Prado's trial counsel ("trial counsel") engaged in a waiver colloquy with Sanmartin Prado; and the following exchange occurred as to Sanmartin Prado's immigration status:

> [TRIAL COUNSEL]: And understand what -- we have had discussions with respect to your immigration status.
>    Is that correct?

---

[1]Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) § 3-601(d), concerning second-degree child abuse, provides now, as it did then:

> (1)    (i) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause abuse to the minor.

> (ii) A household member or family member may not cause abuse to a minor.

> (2) Except as provided in subsection (c) of this section, a person who violates paragraph (1) of this subsection is guilty of the felony of child abuse in the second degree and on conviction is subject to imprisonment not exceeding 15 years.

[2]At the January 6, 2011 proceeding, the prosecutor explained the plea agreement as follows:

> It is my understanding that we are proceeding by way of a not guilty agreed statement of fact to count two, which charges [Sanmartin Prado] with second[-]degree child abuse.

> Upon a finding of guilt, the [S]tate is recommending a period of ten years['] incarceration to the Division of Corrections.  The State will ask that all be suspended except for 12 months.

> Furthermore, upon a finding of guilt, the State will nol pros the balance of the charges.  The State is seeking supervised probation upon [Sanmartin Prado]'s release from incarceration and the State is seeking that [Sanmartin Prado] successfully complete the physical offenders program through the Department of Social Services.

[SANMARTIN PRADO]: Yes, sir.

[TRIAL COUNSEL]: You have a green card and you have been a permanent resident of the United States for over twelve years, is that correct?

[SANMARTIN PRADO]: Yes, sir.

[TRIAL COUNSEL]: You are not under an active deportation order?

[SANMARTIN PRADO]: No.

[TRIAL COUNSEL]: And there's no immigration detainer that we are aware of.
	Is that correct?

[SANMARTIN PRADO]: That's correct.

[TRIAL COUNSEL]: And you understand that I'm not making any promises and the [circuit court] is not making any promises about what the federal government could possibly do in the future with respect to reviewing this conviction.
	Is that correct?

[SANMARTIN PRADO]: Yes, sir.

[TRIAL COUNSEL]: And you still wish to proceed this morning?

[SANMARTIN PRADO]: Yes, sir.

Thereafter, the circuit court announced that "Sanmartin Prado ha[d] waived his rights to a jury trial and to a Court trial in this matter, and that he ha[d] done so voluntarily and understanding the rights that he has."

The State then read into the record the following agreed statement of facts:

[O]n April 28th, 2010, the Crimes Against Children's Unit of the Baltimore County Police Department received information regarding a possible child abuse that occurred to a three-year-old named B[.[3]]

---

[3]Because the child was three years old at the time, we refer to the child by the initial of her first name.

The matter was assigned to Detective Lane to investigate. Detective Lane's investigation revealed that on 4-18-2010, ten days earlier, the child was in her father, . . . Sanmartin Prado's care and during that time she sustained a serious burn to the left side of her face.

During that time the mother of the child, Gina Salinas became aware of the burn.

Together [] Salinas and [] Sanmartin Prado made the decision not to take the child to the hospital, however, the next day, April 19th 2010, the child was taken to Johns Hopkins Hospital. There the mother and [Sanmartin Prado] told the hospital staff a story that consisted of this being an accident. The child was in the bath tub, she turned the water on and she burnt her face.

The police were not called at that time. Days later the police were informed of this injury. The police did interview [] Salinas and she told the police that she had left her child B[.] with [Sanmartin Prado] while she worked and when she came home from work she found B[.] to have a serious burn to the left side of her face.

[Sanmartin Prado] was subsequently interviewed by Detective Lane on May 3rd of 2010. All of this happening well after the child had received care and treatment for what was determined to be second and third degree burns on the left side of her face.

By this point those burns had scabbed over. The injury was just a discoloration to the child's face, however, on May 3rd, 2010, while speaking with Detective Lane, [Sanmartin Prado] after being Mirandized did agree that on April 18th, 2010, while his wife worked, he cared for his children. At some point B[.] woke up from her nap and she was inconsolable. She was crying for her mother and, as he had done in the past, he took the spray from the shower head and as she sat in the bathroom on the toilet he sprayed the water at her. [Sanmartin Prado] would say that most of the water went on the floor, however, the child continued to cry, he believed crying still for her mother.

He would say that he had no idea that the water was as hot as it was.

The bath tub was examined and it was that the faucet was just one faucet for both cold and hot water. The water temp -- well, [Sanmartin Prado] said that he sprayed his daughter in the facial area and the body for approximately two minutes. The water temp was tested and it was found that

- 5 -

after one minute that the water would reach a temperature of 128 degrees.

Studies have shown that at 122 degrees the skin will burn after one minute.

Again, if called to testify, [] Salinas, the mother, would attest she was not home when the burns occurred. Again Detective Lane would attest that [Sanmartin Prado] admitted that as a course of punishment he turned the water on his child not meaning to burn her, is -- would be his words, but that he did, in fact, spray her with the water and that did in fact cause burns that were subsequently seen approximately ten days after being treated.

All events occurred in Baltimore County, and that would be the State's case.

The circuit court found Sanmartin Prado guilty of second-degree child abuse, and sentenced him to five years' imprisonment with all but two years suspended, followed by two years of supervised probation with the condition that Sanmartin Prado complete a physical offender treatment program and a parenting course offered by the Department of Social Services. The charges for first-degree child abuse causing severe physical injury and second-degree assault were nol prossed. Sanmartin Prado did not appeal the conviction.

Over two years later, on October 21, 2013, Sanmartin Prado filed in the circuit court a "Petition for Writ of Error Coram Nobis" ("the petition"), contending that, as a result of the conviction, he was facing a significant collateral consequence, namely, "that he is automatically deportable from the United States[.]" Sanmartin Prado stated that, as of the time of the filing of the petition, he was "in proceedings before the Immigration Court with one of the allegations being the conviction in the [] case to substantiate or to support the government's claim for deportation." Sanmartin Prado alleged that his trial counsel had

rendered ineffective assistance of counsel at the January 6, 2011 plea hearing by failing to advise him that he was subject to automatic deportation as a result of the conviction, and by failing to specify what immigration consequences he could face as a result of conviction, including being subject to automatic deportation. According to Sanmartin Prado, had he known that he would be subject to automatic deportation as a result of the conviction, he would not have pled not guilty on an agreed statement of facts, and instead would have gone to trial. On November 18, 2013, the State filed an answer and motion to dismiss the petition without a hearing, contending, in pertinent part, that trial counsel properly advised Sanmartin Prado of the potential immigration consequences of a conviction.

On January 28, 2014, the circuit court conducted a hearing on the petition. At the hearing, Sanmartin Prado called trial counsel as a witness. Trial counsel testified that he visited Sanmartin Prado in jail before the January 6, 2011 proceeding, and the following exchange occurred concerning trial counsel's discussions with Sanmartin Prado about the immigration consequences of a conviction:

> [CORAM NOBIS COUNSEL]: Now, when you discussed these matters with [] Sanmartin [Prado], did you ask him if he was a citizen of the United States?
>
> [TRIAL COUNSEL]: I don't know if I exactly asked him if he was a citizen, I asked him where he was born, he told me he was from Ecuador, he came to the United States with his mother when he was eighteen and he told me that he was a permanent resident and had a green card and had, had so had that green card since 1998. That's what my notes reflect.
>
> [CORAM NOBIS COUNSEL]: But did you, you did not determine whether or not, since 1998, he had become a citizen?
>
> [TRIAL COUNSEL]: No, I knew he was not a naturalized U.S. citizen, if that's your question.

[CORAM NOBIS COUNSEL]: Now, after having gotten that information, what, if anything, did you explore to determine if any problems he might have with immigration?

[TRIAL COUNSEL]: On December . . . 30th of 2010, I met with [Sanmartin Prado] for the final time at the Detention Center. I explained to him that the, there could and probably would be immigration consequences as a result of the plea but that the, the term of art that I usually use is that immigration is a moving target and that it was, I recall telling him that it was a deportable or a possibly deportable offense, but the plea agreement that the State had offered, he indicated to me that he was interested in taking that and my notes, written on the inside of my file jacket, I can read them verbatim if you'd like.

[CORAM NOBIS COUNSEL]: That's fine. If that refreshes your recollection, that's fine.

\* \* \*

[TRIAL COUNSEL]: It says, [Sanmartin Prado] wants deal, prefer Alford plea, quote, cannot admit guilty, unquote, spoke extensively re imm, I-M-M-period, consequences.

[CIRCUIT COURT]: I'm sorry, slow down, --

[TRIAL COUNSEL]: Which I would take to be immigration consequences.

\* \* \*

[CORAM NOBIS COUNSEL]: Okay. What did you explain to him about immigration consequences?

[TRIAL COUNSEL]: That it's a deportable offense and he could be deported if the Federal government chooses to deport him.

[CORAM NOBIS COUNSEL]: Why is it a deportable offense?

[TRIAL COUNSEL]: Because it is an aggravated felony which carries more than a year in jail.

[CORAM NOBIS COUNSEL]: And where did you get that information from?

[TRIAL COUNSEL]: My, I've always wanted to say this, my training,

- 8 -

knowledge and experience as a lawyer.

[CORAM NOBIS COUNSEL]: That's good. Nothing wrong with that. And at the time that you advised my client --

[CIRCUIT COURT]: Can, can you go, hold on, [coram nobis counsel]. [Trial counsel], you told, you testified that you told [Sanmartin Prado], the question to you was, what consequences did you advise him of and what you said to [Sanmartin] Prado was that it was a deportable offense, he could be deported and then what did you say, if the immigration officials?

[TRIAL COUNSEL]: If the Federal government chooses to exercise their right to deport him.

[CIRCUIT COURT]: Okay.

[TRIAL COUNSEL]: Or to, to initiate deportation proceedings.

* * *

[CORAM NOBIS COUNSEL]: Nowhere in that colloquy [during the January 6, 2011 proceeding] do you ever tell [] Sanmartin Prado that he's automatically deportable as a result of the conviction in this case, correct?

[TRIAL COUNSEL]: No.

* * *

[CORAM NOBIS COUNSEL]: [D]id you ever tell [] Sanmartin Prado that the conviction would make him automatically deportable under all circumstances?

[TRIAL COUNSEL]: I don't know if I used the term automatic but I certainly said it was a deportable offense, so.

Trial counsel also testified that he met with Sanmartin Prado's wife and that his "notes d[id] not reflect that we discussed the possible immigration consequences[,] but I can't believe I would not have discussed those with her[.]"

On cross-examination, the prosecutor asked trial counsel what he meant "by

deportation is a moving target[,]" to which trial counsel responded:

> Especially back in 2009, 2010 even, early into 2011, I found that there was sort of some arbitrary enforcement of the Federal immigration laws. Some people were getting deported, other people were not. Some people were getting deportation orders. So, you know, I guess, in hindsight, you know, I shouldn't have used the term moving target but I think it was clear to [Sanmartin Prado] and I think I made it pretty clear on the record that this was deportable and he and I discussed that and that that was a very real collateral consequence to the plea.

When asked by the prosecutor "at no time did you tell [Sanmartin] Prado you will not be deported as a result of this case[,]" trial counsel emphatically testified: "I absolutely, positively did not tell him you, because if I, if that, if I were that certain, I would have not had the discussion at all."

Sanmartin Prado testified on his own behalf through the assistance of a Spanish-language interpreter. According to Sanmartin Prado, he saw trial counsel at the jail twice without the assistance of an interpreter. Coram nobis counsel asked about Sanmartin Prado's discussions with trial counsel about immigration consequences and the following exchange occurred:

> [CORAM NOBIS COUNSEL]: Did you know when you went to Court that if you were found guilty, you would be deported to your home country?
>
> [SANMARTIN PRADO]: No.
>
> [CORAM NOBIS COUNSEL]: Okay. Did anybody tell you that could happen, either [trial counsel] or anybody else, before you went to Court?
>
> [SANMARTIN PRADO]: No.
>
> [CORAM NOBIS COUNSEL]: Okay. When did you first find out that you were subject to, or you were going to be deported as a result of your case?
>
> [SANMARTIN PRADO]: About maybe six months after I got out from jail,

- 10 -

they came to the house, nobody told me anything, [Immigration and Customs Enforcement] came to the house.

* * *

[CORAM NOBIS COUNSEL]: Okay.  Now, if you would have known that you would be deported by being convicted, would you have not asked for a trial or would you have asked for a trial, in your case, an actual trial?

[SANMARTIN PRADO]: Yes.

On cross-examination, Sanmartin Prado testified that trial counsel never advised him that he could be deported, but acknowledged that he and trial counsel had discussed his immigration status:

[PROSECUTOR]: Sir, it's your testimony that [trial counsel] never told you that you could be deported because of this crime?

[SANMARTIN PRADO]: He never told me, maybe he told me in other words that I did not understand, but he never told me about deportation.

* * *

[PROSECUTOR]: Did [trial counsel] ask you regarding your immigration status? . . . Sir, isn't it true that [trial counsel] asked you if you were a citizen of this country?

[SANMARTIN PRADO]: He asked me but I said no I was a resident.

[PROSECUTOR]: Okay.  So did you talk about your green card and your status in this country?

[SANMARTIN PRADO]: Yes.

[PROSECUTOR]: So you admit that [trial counsel] did have conversations regarding your immigration status?

[SANMARTIN PRADO]: Yes.  Because the first time he saw me, he asked me if I was a resident and I told him yes.

And, in response to the prosecutor's question "Did [trial counsel] ever tell you you would

not be deported as a result of this crime or he never talked to you about deportation?[,]" Sanmartin Prado stated: "He never talked about that."

On June 12, 2014, the coram nobis court issued a Memorandum and Order **(E 7)** denying the petition. In relevant part, the circuit court found:

> [A]t the coram nobis hearing, [] trial counsel testified, and the Court finds as a fact, that he met with [Sanmartin Prado] at the Baltimore County Detention Center before trial and explained the immigration consequences of a guilty verdict, including that this was a "deportable offense" and [Sanmartin Prado] "could be deported . . . if the federal government chose to initiate deportation proceedings," and it was "possible" that [Sanmartin Prado] would be deported. [Sanmartin Prado] testified that trial counsel never told him he "would be deported[,]" but acknowledged that he did have conversations with trial counsel regarding his immigration status.

The circuit court ruled:

> Upon consideration of the evidence presented to this Court as well as the record of the plea hearing, the Court finds that [Sanmartin Prado] has not rebutted the presumption that he "intelligently and knowingly" failed to raise the allegation on appeal and [Sanmartin Prado] has made no showing that special circumstances exist for his failure to make the allegation of error on appeal.

On July 9, 2014, Sanmartin Prado filed a notice of appeal. On October 2, 2015, in a reported opinion, the Court of Special Appeals reversed the judgment of the circuit court and remanded the case to the circuit court for further proceedings. See Sanmartin Prado v. State, 225 Md. App. 201, 214, 123 A.3d 652, 660 (2015). Relevant here, the Court of Special Appeals held that "trial counsel qualified his statements to Sanmartin Prado as to whether a conviction would render him deportable[,]" and that, accordingly, "Sanmartin Prado established that [] trial counsel did not provide him with the correct 'available advice' about the deportation risk." Id. at 213, 123 A.2d at 659. Because Sanmartin Prado

had established the first prong of the Strickland[4] test, the Court "remand[ed] the case to the circuit court to [determine] whether there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 213-14, 123 A.3d at 660 (citation omitted). Thereafter, the State filed in this Court a petition for a writ of *certiorari*, which we granted. See State v. Sanmartin Prado, 446 Md. 291, 132 A.3d 193 (2016).

## DISCUSSION

### The Parties' Contentions

The State contends that the Court of Special Appeals erred in holding that trial counsel's advisement to Sanmartin Prado about the possible immigration consequences of conviction was constitutionally deficient, and that the Court's holding is inconsistent with Padilla, 559 U.S. 356, and this Court's holding in Denisyuk, 422 Md. 462, 30 A.3d 914. According to the State, under Padilla and Denisyuk, a lawyer must advise his or her client of whether there is a "risk of deportation" and "that deportation is a likely consequence of [a] guilty plea." (Citations omitted). The State argues that trial counsel's advice and representation to Sanmartin Prado "fully comported" with Padilla and Denisyuk because trial counsel advised Sanmartin Prado that second-degree child abuse was a deportable offense and that there could and probably would be immigration consequences if he were convicted of the offense. The State asserts that, unlike in Padilla or Denisyuk, trial counsel in this case neither failed altogether to advise Sanmartin Prado concerning immigration

---

[4]Strickland v. Washington, 466 U.S. 668 (1984).

consequences, nor misadvised Sanmartin Prado about the immigration consequences. The State maintains that the holding of the Court of Special Appeals sets a new standard, and is inconsistent with other jurisdictions' holdings in the wake of Padilla, and with the standard set forth in Maryland Rule 4-242(f) (Collateral Consequences of a Plea of Guilty, Conditional Plea of Guilty, or Plea of Nolo Contendere).

Sanmartin Prado responds that the Court of Special Appeals correctly held that trial counsel failed to properly advise him in open court of the immigration consequences of a conviction in accordance with Padilla and Denisyuk. According to Sanmartin Prado, the Court of Special Appeals correctly concluded that proper advisement of immigration consequences consists of defense counsel advising a defendant that he or she is "deportable," without any qualification, such as "if the federal government cho[o]se[s] to initiate deportation proceedings," "possibly deportable," or similar qualifiers. Sanmartin Prado argues that trial counsel's advisement was deficient because trial counsel neither advised that deportation was mandatory and automatic nor advised "without equivocation" that Sanmartin Prado was deportable. Sanmartin Prado asserts that trial counsel misadvised him of the immigration consequences of a conviction by equivocating and stating that he "could be deportable or probably would be deportable and that immigration is a moving target[.]" Sanmartin Prado maintains that trial counsel's advisements led him to believe that there was a possibility that there would be no immigration consequences for a conviction. Sanmartin Prado also contends that the advisements in this case violated Maryland Rule 4-242, which Sanmartin Prado argues requires that an advisement of immigration consequences of a guilty plea be made on the record in open court. In so

contending, Sanmartin Prado points out that, in this case, proceeding by way of a not guilty

plea upon an agreed statement of facts was the functional equivalent of a guilty plea.

In a reply brief, the State contends that Padilla did not require trial counsel to advise

Sanmartin Prado in an unequivocal statement that he would be deported if convicted.  The

State also takes the position that, unlike in Padilla and Denisyuk, Sanmartin Prado did not

enter and was not convicted based upon a guilty plea.  Stated otherwise, the State theorizes

that the not guilty agreed statement of facts arrangement was not the functional equivalent

of a guilty plea.

**Standard of Review**

We review without deference a trial court's resolution of questions of law.  See, e.g.,

State v. Daughtry, 419 Md. 35, 46, 18 A.3d 60, 66 (2011) ("It is well settled that where a

case involves an interpretation and application of case law, [the appellate c]ourt must

determine whether the [trial] court's conclusions are legally correct under a non-deferential

standard of review."  (Citations, brackets, ellipses, and internal quotation marks omitted)).

As to a trial court's determination concerning issues of effective assistance of counsel, in

State v. Jones, 138 Md. App. 178, 209, 771 A.2d 407, 425 (2001), aff'd, 379 Md. 704, 843

A.2d 778 (2004), the Court of Special Appeals has stated:

> The standard of review of the [trial] court's determinations regarding issues of effective assistance of counsel is a mixed question of law and fact. We will not disturb the factual findings of the post-conviction court unless they are clearly erroneous.  But, a reviewing court must make an independent analysis to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed.  In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any. . . . [The appellate court] will evaluate anew the findings of the [trial] court as to the

reasonableness of counsel's conduct and the prejudice suffered. As a question of whether a constitutional right has been violated, we make our own independent analysis by reviewing the law and applying it to the facts of the case.

(Citations, ellipses, and internal quotation marks omitted). See also Coleman v. State, 434 Md. 320, 331, 75 A.3d 916, 923 (2013) ("[T]he . . . components of the ineffectiveness inquiry are mixed questions of law and fact. Thus, in our independent examination of the case, we re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed." (Citations and internal quotation marks omitted)).

**Coram Nobis Relief**

Recently, in State v. Smith, 443 Md. 572, 623-24, 117 A.3d 1093, 1123-24 (2015) (*per curiam*), we described coram nobis relief as follows:

Coram nobis is extraordinary relief designed to relieve a petitioner of substantial collateral consequences outside of a sentence of incarceration or probation where no other remedy exists. "[T]he writ of error coram nobis is an ancient common law device traditionally utilized to correct errors of fact." *Rivera v. State*, 409 Md. 176, 189-90, 973 A.2d 218, 227 (2009) (citation omitted). "The purpose of the writ is to bring before the court facts which were not brought into issue at the trial of the case, and which were material to the validity and regularity of the proceedings, and which, if known by the court, would have prevented the judgment." *Skok v. State*, 361 Md. 52, 68, 760 A.2d 647, 655 (2000) (citation omitted).

In *Skok, id.* at 75, 78, 760 A.2d at 659, 661, we expanded the scope of coram nobis relief, holding that coram nobis applies to both errors of fact and errors of law "on constitutional or fundamental grounds." We explained: "[T]here should be a remedy for a convicted person who is not incarcerated and not on parole or probation, who is suddenly faced with a significant collateral consequence of his or her conviction, and who can legitimately challenge the conviction on constitutional or fundamental grounds." *Id.* at 78, 760 A.2d at 661. We added, however: (1) "the grounds for challenging the criminal conviction must be of a constitutional, jurisdictional or

- 16 -

fundamental character[,]" *id.* at 78, 760 A.2d at 661; (2) "a presumption of regularity attaches to the criminal case, and the burden of proof is on the coram nobis petitioner[,]" *id.* at 78, 760 A.2d at 661; (3) "the coram nobis petitioner must be suffering or facing significant collateral consequences from the conviction[,]" *id.* at 79, 760 A.2d at 661; (4) the issue raised in a coram nobis action must not be waived or finally litigated, *see id.* at 79, 760 A.2d at 661-62; and (5) there must not be another statutory or common law remedy available, *see id.* at 80, 760 A.2d at 662.

## Ineffective Assistance of Counsel

As to effective assistance of counsel, in Taylor v. State, 428 Md. 386, 399-400, 51 A.3d 655, 662 (2012), this Court explained that, in Maryland, we follow the test announced by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), stating:

> Under both the Sixth Amendment and Article 21 of the Maryland Declaration of Rights,[5] a criminal defendant is entitled to the assistance of counsel, which means "the right to the effective assistance of counsel." *Duvall v. State*, 399 Md. 210, 220-21, 923 A.2d 81, 88 (2007) (quoting *Strickland*, 466 U.S. at 686[]) (quotation mark omitted). The defendant who claims that he or she received ineffective assistance of counsel, as a general rule under the test announced in *Strickland* and followed ever since, must make two showings: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." 466 U.S. at 687[.] In regard to the first, "performance" prong of *Strickland*, the defendant must demonstrate that counsel's alleged acts or omissions, based on "the facts of the particular case, viewed as of the time of counsel's conduct," fell "outside

---

[5]In Taylor, 428 Md. at 399 n.8, 51 A.3d at 662 n.8, we stated:

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right is applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 343[] (1963). Article 21 of the Maryland Declaration of Rights declares: "That in all criminal prosecutions, every man hath a right to . . . be allowed counsel[.]"

(Ellipses in original).

the wide range of professionally competent assistance." *Id.* at 690[.]   In regard to the second, "prejudice" prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694[.]

As to the second prong, we have explained that "the standard to be used is whether there is a substantial or significant possibility that the verdict of the trier of fact would have been affected." Coleman, 434 Md. at 331, 75 A.3d at 923 (citations and internal quotation marks omitted).

**Maryland Rule 4-242(f)**

Maryland Rule 4-242(f), entitled "Collateral Consequences of a Plea of Guilty, Conditional Plea of Guilty, or Plea of Nolo Contendere," provides that non-citizens be advised of immigration consequences of a plea as follows:

Before the court accepts a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant (1) **that by entering the plea, if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship**, (2) that by entering a plea to the offenses set out in Code, Criminal Procedure Article, § 11-701,[6] the defendant shall have to register with the defendant's supervising authority as defined in Code, Criminal Procedure Article, § 11-701(p), and (3) that the defendant should consult with defense counsel if the defendant is represented and needs additional information concerning the potential consequences of the plea. The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.[7]

---

[6]That statute concerns sex offender registration.
[7]In 2011, the provisions of Maryland Rule 4-242(f) were contained at Maryland Rule 4-242(e). See Md. R. 4-242(e) (2011); Rules Order on 165th Report (Oct. 20, 2010), at 7, available at http://www.mdcourts.gov/rules/rodocs/ro165.pdf [https://perma.cc/4EG9

(Emphasis added).

## 8 U.S.C. § 1227

As of the January 6, 2011 proceeding in this case, 8 U.S.C. § 1227, concerning "Deportable aliens," provided, in relevant part, as it does now:

(a) Classes of deportable aliens

Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:

. . .

(2) Criminal offenses

(A) General crimes

. . .

(iii) Aggravated felony

Any alien who is convicted of an aggravated felony at any time after admission is deportable.[8]

---

-3LHQ]. Effective January 1, 2013, and as a result of the addition of a new section (d) pertaining to conditional pleas of guilty, Maryland Rule 4-242(e) became Maryland Rule 4-242(f). At that time, there was a slight change to the beginning of Maryland Rule 4-242(f) to add the words "a conditional plea of guilty." See Md. R. 4-242(f) (2013); Rules Order on 174th Report (Nov. 1, 2012), at 22, 26-27, available at http://www.mdcourts.gov/rules/rodocs/ro174categories145912.pdf [https://perma.cc/62V6-MPJN]. No other substantive changes were made to Maryland Rule 4-242(f). For clarity, we shall refer to the current version of Maryland Rule 4-242(f).

[8]"Aggravated felony" is defined, in relevant part, as "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year[.]" 8 U.S.C. § 1101(a)(43)(F). A "crime of violence," in turn, is defined as:

. . .

       (E) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and

       (i) Domestic violence, stalking, and child abuse

       Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable.

### Padilla v. Kentucky

In <u>Padilla</u>, 559 U.S. at 369, 360, the Supreme Court held that "Padilla ha[d] sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland*" because "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." Indeed, for the first time, the Supreme Court held that, pursuant to the Sixth Amendment right to counsel, "counsel must inform [his or] her client whether his [or her] plea carries a risk of deportation." <u>Id.</u> at 374. In <u>Padilla</u>, <u>id.</u> at 359, Padilla, a native of Honduras who had been a legal permanent resident of the United States for more than forty years, pleaded guilty to transportation of a large amount of marijuana. Padilla later sought post-conviction relief,

---

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk of physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

alleging that his counsel both failed to advise him of the immigration consequences of his plea and misadvised "him that he did not have to worry about his immigration status since he had been in the country so long." Id. (citation and internal quotation marks omitted). According to Padilla, he relied on his counsel's erroneous advice when he pleaded guilty, and, had he received correct advice, "he would have insisted on going to trial[.]" Id. The Supreme Court of Kentucky concluded that Padilla was not entitled to post-conviction relief. See id. The Supreme Court then granted *certiorari* to determine "whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." Id. at 360.

The Supreme Court began by examining the evolution of federal immigration law over the past century, observing that, "[w]hile once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation." Id. According to the Supreme Court, under current immigration laws, deportation or removal "is now virtually inevitable for a vast number of noncitizens convicted of crimes." Id. As a result, "[t]he importance of accurate legal advice for noncitizens accused of crimes has never been more important." Id. at 364.

The Supreme Court then determined that the Sixth Amendment right to counsel, and the Strickland test for effective assistance of counsel, were applicable to Padilla's claim. Id. at 366. As to the first prong of Strickland—whether "counsel's representation fell below an objective standard of reasonableness"—the Supreme Court stated that "[t]he

weight of prevailing professional norms supports the view that counsel must advise [his or] her client regarding the risk of deportation." Id. at 366-67 (citations and internal quotation marks omitted). Considering the circumstances of Padilla's case, the Supreme Court explained:

> In the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequences for Padilla's conviction. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less or marijuana, is deportable"). Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

Padilla, 559 U.S. at 368-69 (ellipsis in original). The Supreme Court nonetheless recognized that "[i]mmigration law can be complex," and that there may be "situations in which the deportation consequences of a particular plea are unclear or uncertain." Id. at 369. Under those circumstances, "[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. (footnote omitted). However, "when the deportation consequence is truly clear, as it was in [Padilla's] case, the duty to give **correct advice** is equally clear." Id. (emphasis added). Thus, the Supreme Court concluded that Padilla had sufficiently alleged that his counsel

- 22 -

provided constitutionally deficient representation, satisfying the first prong of <u>Strickland</u>,

and that the Kentucky courts would need to determine "in the first instance" whether

Padilla had satisfied the second prong of <u>Strickland</u>, concerning prejudice. <u>Id.</u>

The Supreme Court also rejected the United States's contention that "*Strickland*

applies to Padilla's claim only to the extent that he ha[d] alleged affirmative misadvice."

<u>Id.</u> According to the Supreme Court, such a holding would lead to "two absurd results":

> First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement. When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all. Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide [his or] her client with available advice about an issue like deportation and the failure to do so clearly satisfies the first prong of the *Strickland* analysis.

<u>Id.</u> at 370-71 (citations, footnote, and internal quotation marks omitted). The Supreme

Court noted, though, that "[s]urmounting *Strickland*'s high bar is never an easy task." <u>Id.</u>

at 371 (citations omitted). The Supreme Court concluded as follows:

> It is our responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the mercies of incompetent counsel. To satisfy this responsibility, **we now hold that counsel must inform [his or] her client whether his [or her] plea carries a risk of deportation.** Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

> Taking as true the basis for his motion for postconviction relief, we have little difficulty concluding that Padilla has sufficiently alleged that his counsel was constitutionally deficient. Whether Padilla is entitled to relief

- 23 -

will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below.

Id. at 374-75 (emphasis added) (citations and internal quotation marks omitted).

## **Denisyuk v. State**

Over a year later, in Denisyuk, 422 Md. at 466, 30 A.3d at 916, this Court held, in relevant part, that "defense counsel's failure to advise [the defendant] of the deportation consequence of his guilty plea was constitutionally deficient[,]" and that, "based on the record developed at the postconviction hearing and the court's express finding on the subject, [] counsel's deficient performance prejudiced [the defendant]."[9] In other words, in Denisyuk, 422 Md. at 466, 489, 30 A.3d at 916, 930, applying Padilla, this Court determined that a defendant's counsel rendered ineffective assistance where the defendant's counsel failed to advise the defendant whatsoever of the immigration consequences of his guilty plea. In Denisyuk, 422 Md. at 466-67, 30 A.3d at 916, the defendant, a noncitizen, pleaded guilty to second-degree assault pursuant to a plea agreement. At the guilty plea proceeding, neither defense counsel, the State, nor the trial

---

[9]In Denisyuk, 422 Md. at 466, 30 A.3d at 916, this Court also held that "*Padilla* applies to postconviction claims arising from guilty pleas obtained after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 . . . (effective April 1, 1997)[.]" A couple of years later, in Miller v. State, 435 Md. 174, 185, 77 A.3d 1030, 1036 (2013), this Court stated that, in Chaidez v. United States, ___ U.S. ___, 133 S. Ct. 1103 (2013), the Supreme Court "held that *Padilla* did not apply retroactively . . . because *Padilla* had announced a 'new rule' of constitutional criminal procedure." In other words, our holding in Denisyuk concerning the retroactive effect of the Supreme Court's holding in Padilla was abrogated by Chaidez. Indeed, in Chaidez, __ U.S. __, 133 S. Ct. at 1110, the Supreme Court explained that, when it decided Padilla, it "answered a question about the Sixth Amendment's reach that [it] had left open, in a way that altered the law of most jurisdictions[.]"

court advised the defendant of the immigration consequences of the plea. See id. at 467, 30 A.3d at 917. Later, the defendant filed a petition for post-conviction relief, alleging that the guilty plea was involuntary because he was not advised of the potential immigration consequences of the plea and that defense counsel's failure to advise him of the potential immigration consequences of the plea constituted ineffective assistance of counsel. See id. at 467, 30 A.3d at 917. In an affidavit submitted to the trial court, the defendant averred that, had he been advised of the immigration consequences of the plea, he would have rejected the plea offer and proceeded to trial. See id. at 467, 30 A.3d at 917. The trial court granted the petition for post-conviction relief, and the State thereafter filed an application for leave to appeal, which was granted. See id. at 468, 30 A.3d at 917-18. The Court of Special Appeals reversed the grant of post-conviction relief. See id. at 468, 30 A.3d at 918. This Court then granted *certiorari*. See id. at 469, 30 A.3d at 918.

After concluding that Padilla applied, this Court held that the defendant's counsel "was obligated, but failed, to provide advice on the deportation consequences of [the defendant]'s plea, [and] that [the defendant]'s trial counsel's performance was constitutionally deficient." Id. at 482, 30 A.3d at 925. We concluded that the first prong of Strickland was satisfied because, "by application of *Padilla*, [the defendant]'s counsel's performance was deficient because it fell below the standard of prevailing professional norms." Id. at 485, 30 A.3d at 927. As to the second prong of Strickland—whether the defendant was prejudiced by his counsel's deficient performance—we determined that the defendant had satisfied that prong as well. See id. at 489, 30 A.3d at 930. We explained that, because the defendant's "sworn statement that he would have opted to go to trial if he

- 25 -

had known of the likelihood of deportation, which was credited by the court, had he received the advice required by *Padilla*, he would have opted to go to trial[,]" the defendant had satisfied the second prong of Strickland, *i.e.*, demonstrated that he was prejudiced by "his counsel's deficient performance." Id. at 489, 30 A.3d at 930. Accordingly, because the defendant had satisfied both prongs of Strickland and thus demonstrated that his counsel had provided ineffective assistance, we agreed with the trial court that the defendant should be granted a new trial. See id. at 489, 30 A.3d at 930.

## Authority from Other Jurisdictions

Similarly, courts in other jurisdictions have held that a defendant's counsel's performance was constitutionally deficient where the defendant's counsel either failed to advise the defendant whatsoever of the immigration consequences of the defendant's guilty plea, or affirmatively misadvised the defendant about the immigration consequences of the defendant's guilty plea. For example, in United States v. Bonilla, 637 F.3d 980, 981 (9th Cir. 2011), the Ninth Circuit held that the trial court abused its discretion in denying the defendant's motion to withdraw his guilty plea where, after entering his guilty plea, the defendant "was for the first time informed that he would be deported on the basis of his plea[.]" In Bonilla, id., the defendant, a native of Mexico, was charged by indictment with possessing an unregistered firearm and being a felon in possession of a firearm. After the indictment, the defendant's wife contacted an investigator with the Federal Public Defender's Office to ask whether the defendant could possibly be deported as a result of the charges; the investigator told the defendant's wife to contact the defendant's counsel; the defendant's wife then asked the defendant's counsel whether the defendant could

possibly be deported if he pleaded guilty, and the defendant's counsel told the wife "that she would look into the matter but never did, and failed to provide any information about immigration consequences to [the defendant] or his wife prior to the plea hearing." Id. at 981-82. The defendant pleaded guilty to both charges. See id. at 982. Afterwards, the defendant's wife again asked the defendant's counsel about the immigration consequences of the guilty plea. See id. Several days later, the defendant's counsel advised the defendant's wife that, as a result of the guilty plea, the defendant would be deported after serving his sentence; the defendant's counsel explained that she had mistakenly believed that the defendant was a United States citizen. See id. The defendant later moved to withdraw his guilty plea; the trial court denied the motion; and the defendant appealed. See id. at 982-83.

The Ninth Circuit explained that it was undisputed that the defendant "received 'inadequate legal advice' about the immigration consequences of his plea" because, in actuality, the defendant "received *no* advice about immigration consequences before entering his plea, only learning afterward that pleading guilty would almost certainly result in deportation." Id. at 984 (emphasis in original) (citations omitted). The Ninth Circuit stated that "[a] criminal defendant who faces almost certain deportation is entitled to know more than that it is *possible* that a guilty plea could lead to removal; he is entitled to know that it is a virtual certainty." Id. (emphasis in original) (citation omitted). And, under the circumstances of the case, the Ninth Circuit determined that, because the defendant's wife had inquired of counsel the immigration consequences and had been provided no information prior to the defendant pleading guilty, the defendant could reasonably "have

inferred that he likely would not be deported if he pled[.]" Id. Indeed, according to the Ninth Circuit, "a reasonable person in [the defendant]'s position could well have interpreted his lawyer's silence to mean that pleading guilty would not place him in jeopardy of deportation[.]" Id. at 984-85. The Ninth Circuit concluded that, although the defendant may have been aware prior to pleading guilty "about the *possibility* that there might be a reason not to plead to the indictment, because of his lawyer's failure to answer his wife's question he did not know whether that possibility was likely to have any real consequences." Id. at 985 (emphasis in original). Indeed, it was only after pleading guilty that the defendant learned "that the plea would in fact make his deportation virtually certain." Id. Under those circumstances, the Ninth Circuit held that the trial court abused its discretion in denying the defendant's motion to withdraw his plea. See id. at 986.

In a similar vein, in United States v. Akinsade, 686 F.3d 248, 250 (4th Cir. 2012), the Fourth Circuit reversed the trial court's denial of the defendant's petition for writ of error coram nobis where the defendant's counsel affirmatively misadvised the defendant that he would not be deported. In Akinsade, id., the defendant, a native of Nigeria who became a lawful permanent resident, was charged with embezzlement by a bank employee. The defendant asked his counsel on at least two occasions about the potential immigration consequences of a guilty plea. See id. On each occasion, contrary to the law at that time, the defendant's counsel "misadvised him that he could not be deported based on th[e] single offense" and "that he could only be deported if he had two felony convictions." Id. Relying on that misadvice, the defendant pleaded guilty pursuant to a plea agreement, which did not mention that deportation was mandatory or possible due to the offense. See

- 28 -

id. During the plea proceeding, the trial court reviewed the consequences of the plea, including that, "if you are not a citizen, you could be deported." Id. The defendant said that he understood and affirmatively stated that he still wished to plead guilty. See id. Years later, while under the threat of deportation, the defendant filed a petition for writ of error coram nobis, alleging ineffective assistance of counsel based on his counsel's misadvice. See id. at 251. Although holding that the defendant's counsel's affirmative misadvice rendered his assistance constitutionally deficient, the trial court denied the petition, concluding that the defendant was not prejudiced. See id. The defendant appealed. See id.

The Fourth Circuit focused its analysis on "the merits of [the defendant]'s ineffective assistance of counsel claim to decide whether [the defendant] ha[d] been prejudiced." Id. at 253 (citation omitted). As to that point, the Fourth Circuit acknowledged that "[a] defendant may be unable to show prejudice if at the [plea] proceeding the [trial] court provides an admonishment that corrects the misadvice and the defendant expresses that he [or she] understands the admonishment." Id. (citations omitted). The Fourth Circuit concluded that the trial court's admonishment was insufficient to correct the defendant's counsel's misadvice that the crime was not a deportable offense because it was not "a careful explanation of the consequences of deportation" and instead simply "warned that [the defendant]'s plea *could* lead to deportation." Id. at 254 (emphasis in original) (internal quotation marks omitted). The Fourth Circuit concluded "that counsel's affirmative misrepresentations that the crime at issue was non-deportable prejudiced" the defendant because the record demonstrated that,

but for the misadvice, the defendant would not have pleaded guilty. Id. at 256. Because the defendant had demonstrated prejudice, the Fourth Circuit concluded that he "also demonstrated that he ha[d] suffered a fundamental error necessitating coram nobis relief." Id.

In the wake of Padilla, courts in various other jurisdictions also have addressed the extent of Padilla's holding and have grappled with whether counsel's use of qualifying words when advising a defendant about immigration consequences—as opposed to counsel's failing altogether to advise or affirmatively misadvising—renders that counsel's performance constitutionally deficient under Strickland. For example, in United States v. Rodriguez-Vega, 797 F.3d 781, 784, 788 (9th Cir. 2015), the Ninth Circuit held that the trial court "err[ed] in failing to hold that . . . [the defendant]'s counsel's assistance was ineffective" where the defendant's counsel "never informed [the defendant before she pleaded guilty] that she faced anything more than the mere 'potential' of removal." In Rodriguez-Vega, id. at 784, the defendant, a native of Mexico who became a legal permanent resident of the United States, was charged with the felony of attempted transportation of illegal aliens and aiding and abetting. The defendant's counsel initially presented the defendant with a plea agreement requiring the defendant "to stipulate to removal following her criminal sentence"; the defendant rejected the plea agreement. Id. at 784-85. The defendant's counsel then presented a revised plea agreement that did not include the stipulation for removal, and instead included a provision entitled "Immigration Consequences," which stated, in pertinent part:

Defendant recognizes that pleading guilty may have consequences with

> respect to her immigration status if she is not a citizen of the United States. . . . Defendant nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that [her] plea may entail, even if the consequence is [her] automatic removal from the United States.

Id. at 785 (ellipsis in original). The defendant thereafter pleaded guilty to the misdemeanor of attempted transportation of an illegal alien. See id. At the plea proceeding, the magistrate judge advised the defendant that "*potentially* [she] could be deported or removed, *perhaps*." Id. (emphasis in original). Later, at sentencing, the defendant's counsel, while addressing the trial court, stated that "there is a high likelihood that [the defendant would] be deported. It's still *probably* considered an aggravated felony for purposes of immigration law." Id. (emphasis in original) (internal quotation marks omitted).

The defendant later filed a petition to vacate her conviction "on the ground that her counsel provided ineffective assistance by failing to adequately advise her regarding the immigration consequences of her plea." Id. The defendant denied that her counsel had ever advised her that pleading guilty would cause her to be removed from the country. See id. The defendant's counsel stated that he spoke with the defendant about the potential immigration consequences of pleading guilty, explained that there was the potential to be deported, and advised that "she had a better chance with Immigration with a misdemeanor than a felony." Id. at 785-86. The trial court denied the petition to vacate, and the defendant appealed. See id. at 786.

On appeal, the Ninth Circuit held that the defendant's "counsel was required to advise [the defendant] that her conviction rendered her removal virtually certain, or words

to that effect[,]" explaining that, as in <u>Padilla</u>, "the immigration statute expressly identifie[d the defendant]'s conviction as a ground for removal[,]" and that her "conviction of a removable offense render[ed the defendant's] removal practically inevitable." <u>Rodriguez-Vega</u>, 797 F.3d at 786 (citations and internal quotation marks omitted). The Ninth Circuit rejected various arguments in support of the contention that the defendant's counsel's performance was not constitutionally deficient. <u>See</u> <u>id.</u> at 786-87. For example, the Ninth Circuit stated that the circumstance that the defendant may have "theoretically" been able to avoid removal under certain statutes, such as the family member exception for first-time offenders, by receiving withholding of removal, or by qualifying for relief under the Convention Against Torture, did "not alter [the] conclusion that on the record . . . [the defendant's] removal was virtually certain." <u>Id.</u> (footnote omitted). The Ninth Circuit also determined that the defendant's "counsel's statements made after [the defendant] had already pled guilty, that she faced a 'high likelihood' of removal, [failed to] satisfy his duty to accurately advise his client of the removal consequences of a plea *before* she entered into it." <u>Id.</u> at 787 (emphasis in original) (citations omitted). According to the Ninth Circuit, "had [the defendant] been properly and timely advised, [the defendant] could have instructed her counsel to attempt to negotiate a plea that would not result in her removal." <u>Id.</u> (citations omitted). The Ninth Circuit concluded that, "[b]ecause the immigration consequences of [the defendant's] plea were clear and her removal was virtually certain, . . . counsel's performance [was] constitutionally ineffective." <u>Id.</u> at 788 (citation omitted).

In <u>State v. Favela</u>, 311 P.3d 1213, 1214 (N.M. Ct. App. 2013), <u>aff'd</u>, 343 P.3d 178 (N.M. 2015), the Court of Appeals of New Mexico held that the defendant's counsel

provided "deficient representation" where the defendant's counsel stated at the plea proceeding that "more than likely [the defendant] will have a great consequence on his papers being taken away." (Ellipsis omitted). In <u>Favela</u>, 311 P.3d at 1214, the defendant, a native of Mexico who became a legal permanent resident, pleaded guilty to four counts of aggravated battery with a deadly weapon and one count of driving under the influence. At the plea proceeding, the trial court asked the defendant's counsel whether there was "an immigration consequence" in the case. <u>Id.</u> The defendant's counsel responded: "There will be. Defendant is here legal and everything, he has his paper documentation and everything, but more than likely he will have a great consequence on his papers being taken away." <u>Id.</u> (brackets and ellipsis omitted). Immediately thereafter, the trial court addressed the defendant, stating: "I want to be sure you understand, as your attorney said, that a conviction will have an effect on your immigration status and that effect would be deportation, which is now called removal, exclusion from the United States and denial of naturalization under the laws of the United States. Do you understand[?]" <u>Id.</u> at 1214-15 (brackets omitted). In response, the defendant stated that he understood and that he still desired to plead guilty. <u>See id.</u> at 1215. The trial court accepted the defendant's guilty plea. <u>See id.</u> Later, the defendant filed a motion for relief or, alternatively, a petition for a writ of habeas corpus, which the trial court summarily denied. <u>See id.</u> The defendant filed a motion for reconsideration, and the trial court conducted a hearing, after which the trial court denied the motion. <u>See id.</u> The defendant then appealed. <u>See id.</u>

On appeal, the Court of Appeals of New Mexico explained that, in a previous case, the Supreme Court of New Mexico had "clearly articulated what constitute[d] effective

assistance of counsel with respect to advising a criminal defendant of the immigration consequences of his or her plea." Id. at 1218. Specifically, in Favela, id., the Court observed that, in State v. Paredez, 101 P.3d 799, 805 (N.M. 2004), the Supreme Court of New Mexico "held that 'criminal defense attorneys are obligated to determine the immigration status of their clients. If a client is a non-citizen, the attorney must advise that client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain.'" The Court further explained the holding of Paredez as follows:

> In so holding, our Supreme Court agreed with those jurisdictions that have held that an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is objectively unreasonable and went one step further in concluding that an attorney's non-advice to an alien defendant on the immigration consequences of a guilty plea would also be deficient performance. According to our Supreme Court, advice that a defendant "could" or "might" be deported is also inadequate, as such advice is incomplete and therefore inaccurate because stating that a person 'may' be subject to deportation implies there is some chance, potentially a good chance, that the person will not be deported. This Court has since interpreted *Paredez* as requiring a definite prediction as to the likelihood of deportation based on the crimes to which a defendant intends to plead and the crimes listed in federal law for which a defendant can be deported.

Favela, 311 P.3d at 1218 (citations, ellipsis, brackets, and some internal quotation marks omitted). The Court observed that, following Paredez, the Supreme Court decided Padilla and "similarly held that counsel must inform her client whether his plea carries a risk of deportation." Favela, 311 P.3d at 1218 (citations and internal quotation marks omitted). The Court noted, however, that the holding in Padilla, although "similar in nature to *Paredez*, was not as broad on the issue of what constitutes deficient representation." Favela, 311 P.3d at 1218. Because Paredez was broader and contained no limitation, as in

- 34 -

<u>Padilla</u>, distinguishing between where "the deportation consequence is truly clear" and where "the law is not succinct and straightforward[,]" the Court held that it was bound by <u>Paredez</u>. <u>Favela</u>, 311 P.3d at 1218 (citation omitted).

The Court further held that, given the holding in <u>Paredez</u>, "a court's warning or advisement to a defendant regarding possible immigration consequences of accepting a plea is never, by itself, sufficient to cure the prejudice that results from ineffective assistance of counsel[.]" <u>Favela</u>, 311 P.3d at 1222. Indeed, the Court determined that, "[b]ecause a defendant whose attorney has not advised him of the immigration consequences of his plea has likely not advocated for a plea aimed at avoiding automatic deportation, the trial court's advice to a defendant that he may or will be deported cannot cure counsel's deficient representation." <u>Id.</u> Applying New Mexico precedent, the Court ultimately remanded the case to the trial court for further proceedings, through which the trial court could "hear evidence and reconsider both prongs of [the d]efendant's ineffective assistance of counsel claim." <u>Id.</u> at 1223.

By contrast, in <u>Chacon</u>, 409 S.W.3d at 534, 532, the Court of Appeals of Missouri held that a defendant's counsel's performance was not deficient where the defendant's counsel advised the defendant that "if he pled guilty to the charges, he would *very likely be deported* and wouldn't be able to come back" and advised the defendant to seek advice from an immigration lawyer. (Emphasis in original) (internal quotation marks omitted). In <u>Chacon</u>, <u>id.</u> at 531, the defendant, a native of Mexico, was charged with possession of cocaine and forgery. At the plea hearing, although there was no discussion of the risk of deportation, the defendant confirmed, among other things, that he had discussed his case

with his counsel and that he was happy with his counsel's representation.  See id. at 532.

The defendant later filed a motion, contending that he had received ineffective assistance

of counsel because his counsel had failed to advise him that he would be deported if he

pleaded guilty.  See id.  The trial court conducted an evidentiary hearing, at which the

defendant's counsel testified that the defendant had asked him about the risk of deportation,

and that he advised the defendant "that if he pled guilty to the charges, he would *very likely*

*be deported* and wouldn't be able to come back" and that the defendant should seek advice

from an immigration lawyer.  Id. (emphasis in original).  The trial court denied the motion,

and the defendant appealed.  See id. at 532-33.

The Court of Appeals of Missouri first examined the defendant's convictions and

the applicable immigration law, stating that the defendant's visa had expired.  See id. at

534.  According to the Court, the law was "clear that, after pleading guilty to cocaine

possession and forgery, [the defendant] was deportable, meaning that deportation was

virtually inevitable."  Id. (citation and internal quotation marks omitted).  The Court

rejected the defendant's contention that, under Padilla, his counsel "was required to

specifically inform him that he was subject to mandatory deportation."  Chacon, 409

S.W.3d at 536 (internal quotation marks omitted).  Rather, the Court explained that, under

Padilla, "when the deportation consequence is clear, as it was in *Padilla* and as it [was

t]here, defense counsel has a[ ] clear duty to give correct advice."  Chacon, 409 S.W.3d at

537 (citation omitted).  Applying that standard, the Court concluded that the defendant's

"counsel satisfied the performance requirement set forth in Padilla" by advising the

defendant as he did.  Chacon, 409 S.W.3d at 537.  The Court explained that "*Padilla* does

not require that counsel use specific words to communicate to a defendant the consequences of entering a guilty plea[,]" but instead "requires that counsel *correctly* advise his client of the *risk* of deportation so that the plea is knowing and voluntary." Chacon, 409 S.W.3d at 537 (emphasis in original). Thus, by advising the defendant that deportation was "very likely," the defendant's counsel adequately advised the defendant of the risk of deportation. Id.

Similarly, in Shata, 868 N.W.2d at 96, the Supreme Court of Wisconsin held that a defendant's counsel "did not perform deficiently" where the defendant's counsel correctly advised the defendant "that his guilty plea carried a 'strong chance' of deportation." In Shata, id., the defendant, an Egyptian foreign national, was charged with one count of possession with intent to deliver marijuana, as party to a crime. At a plea hearing, the defendant's counsel informed the trial court that the defendant did not want to be deported; the parties then conducted an off-the-record discussion. See id. at 97. Before the trial court, the prosecutor presented the plea agreement, and the defendant's counsel stated that he had informed the defendant "that there's a potential he could be deported." Id. (internal quotation marks omitted). The defendant's counsel further stated: "He's not a United States citizen, [] there's a potential he could be deported." Id. The defendant stated that he understood and that he wished to plead guilty. See id. The trial court informed the defendant of the possible immigration consequences of pleading guilty, stating: "[I]f you're not a citizen of the United States [] a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law." Id. The defendant stated that he understood

and proceeded to plead guilty. See id. at 97-98. The trial court thereafter observed that the defendant had signed a plea questionnaire and waiver of rights form that contained the same immigration warning that the trial court had given in court. See id. at 98. The trial court ascertained with both the defendant and the defendant's counsel that the two had discussed and gone over the forms. See id. The trial court then accepted the guilty plea. See id.

Several months later, the defendant moved to withdraw the guilty plea, arguing that his counsel should have advised him that he was subject to mandatory deportation. See id. at 99. At a hearing on the motion, the defendant's counsel testified that he had informed the defendant "of the potential for deportation if convicted[,]" but had not told the defendant that deportation was mandatory. See id. The defendant's counsel also testified that, prior to the guilty plea, he had advised the defendant "that he may be deported, that there's a strong chance that he could be deported." Id. at 99-100 (ellipsis and internal quotation marks omitted). By contrast, the defendant testified that he would not have pleaded guilty had he known that he would be subject to mandatory deportation, and testified that his counsel had told him: "[I]f you get probation, you're not going to be deported." Id. at 100 (internal quotation marks omitted). The trial court ultimately found the defendant's counsel "more credible and that counsel had informed [the defendant] of a strong likelihood of deportation if convicted"; accordingly, the trial court found that the defendant's counsel had not performed deficiently, and that the defendant had not received ineffective assistance of counsel. Id. The trial court denied the motion to withdraw the guilty plea; the defendant appealed; the intermediate appellate court reversed the trial

court's judgment; and the State of Wisconsin petitioned for review.  See id. at 101.

At the outset, the Supreme Court of Wisconsin held that the defendant had not received ineffective assistance of counsel, explaining:

> [The defendant]'s attorney did not perform deficiently.  [The defendant]'s attorney was required to "give correct advice" to the defendant about the possible immigration consequences of his conviction.  *Padilla*, 559 U.S. at 369[.  The defendant]'s attorney satisfied that requirement by correctly advising [the defendant] that his guilty plea carried a "strong chance" of deportation.  [The defendant]'s attorney was *not* required to tell him that his guilty plea would absolutely result in deportation.  In fact, [the defendant]'s deportation was not an absolute certainty.  Executive action, including the United States Department of Homeland Security's exercise of prosecutorial discretion, can block the deportation of deportable aliens.  Because [the defendant]'s trial counsel did not perform deficiently, we do not address the issue of prejudice.

Id. at 96 (emphasis in original) (footnote omitted).  The Court explained that the parties agreed that the defendant's "conviction clearly made him deportable[,]" but that the issue of whether the defendant's "counsel performed deficiently hinge[d] on whether he gave [the defendant] correct advice regarding the possibility of being deported."  Id. at 103.  To that end, the Court observed that, in Padilla, 559 U.S. at 369, the Supreme Court stated that "when the deportation consequence is truly clear, . . . the duty to give *correct advice* is equally clear."  Shata, 868 N.W.2d at 108 (ellipsis and emphasis in original).

As to whether the defendant's counsel had given the defendant correct advice, in Shata, id. at 108-09, the Court explained in detail why "deportation is not an absolutely certain consequence of a conviction for a deportable offense," stating:

> [W]hether immigration personnel would necessarily take all the steps needed to institute and carry out an alien's actual deportation is not an absolute certainty[.]  For example, prosecutorial discretion and the current administration's immigration policies provide possible avenues for

deportable aliens to avoid deportation.  In fact, the executive branch has essentially unreviewable prosecutorial discretion with respect to commencing deportation proceedings, adjudicating cases, and executing removal orders.

Indeed, the secretary of the United States Department of Homeland Security ("DHS") recently explained that the DHS, which is responsible for enforcing the nation's immigration laws, must exercise prosecutorial discretion in the enforcement of the law. Due to limited resources, DHS cannot respond to all immigration violations or remove all persons illegally in the United States.  DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding.  In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding whether to settle or dismiss a case and whether to grant deferred action or a stay of removal[.]  Deportation is not mandatory for a felony conviction.  Rather, certain aliens, including those convicted of a felony, are generally prioritized for removal unless, based on the totality of the circumstances, the alien should not be an enforcement priority. Relevant factors include an alien's length of time in the United States and family or community ties in the United States.  **Because deportation is not an absolutely certain consequence of a conviction for a deportable offense, *Padilla* does not require an attorney to advise an alien client that deportation is an absolute certainty upon conviction of a deportable offense, including a controlled substance offense.**

(Bolding added) (citations, brackets, ellipses, footnotes, italics, and most internal quotation marks omitted).  As the Court further explained, in <u>Padilla</u>, the Supreme Court "never stated that Padilla would absolutely be deported[,]" but rather, the context made clear that the Supreme "Court meant that Padilla clearly was deportable under that immigration statute, not that he clearly would be deported."  <u>Shata</u>, 868 N.W.2d at 109 (citations omitted).  According to the Supreme Court of Wisconsin, in <u>Padilla</u>, the Supreme Court simply held that counsel must advise his or her client that his or her plea carries a risk of deportation, but "did not hold that an attorney must inform an alien client that a conviction for a deportable offense will absolutely result in deportation" and "did not require an

attorney [to] use any particular words, such as 'inevitable deportation,' or to even convey the idea of inevitable deportation." Shata, 868 N.W.2d at 110 (citations and emphasis omitted).

After thoroughly reviewing the Supreme Court's holding in Padilla, in Shata, 868 N.W.2d at 112-13, the Supreme Court of Wisconsin rejected the defendant's contention that counsel needed to have advised him that he would absolutely be deported if convicted, explaining:

> [The defendant]'s position—that his attorney was required to tell him that "his conviction would absolutely result in deportation"—is unworkable and untenable. That advice would be incorrect because a defense attorney does not control and cannot know with certainty whether the federal government will deport an alien upon conviction. If we were to adopt [the defendant]'s position, the unintended consequence may be that an alien defendant could be essentially precluded from ever pleading guilty or no contest to a crime. Why would the State make a plea bargain offer to such a defendant knowing that it could almost always be withdrawn? If we adopted [the defendant]'s position, then an alien might not ever be able to knowingly, intelligently, and voluntarily plead or even decide to proceed to trial. *Padilla* requires advice to be correct and, unlike in *Padilla*, the advice that [the defendant] received was actually correct. [The defendant]'s arguments fail because the advice that he received—that there was a "strong chance" of deportation—was correct and accurate and he entered a knowing, intelligent, and voluntary plea with that understanding.

The Court concluded that, under the circumstances of the case, the defendant's counsel did not perform deficiently in advising the defendant about the risk of deportation because that advice was correct. See id. at 114.

In Commonwealth v. Escobar, 70 A.3d 838, 841 (Pa. Super. Ct. 2013), appeal denied, 86 A.3d 233 (Pa. 2014), the Superior Court of Pennsylvania held that, under Padilla, to give "correct advice" did not "necessarily mean[ that] counsel, when advising

[the defendant] about his deportation risk, needed to tell [the defendant] he definitely would be deported." In Escobar, 70 A.3d at 840, prior to pleading guilty to possession with intent to deliver a controlled substance, the defendant's counsel advised the defendant that it was "'likely and possible' that deportation proceedings would be initiated against him[,]" and the defendant "signed a written plea colloquy containing two entries indicating [the defendant] understood deportation was possible." The defendant later filed a petition for post-conviction relief, contending that his counsel provided ineffective assistance by "failing to properly advise him of the deportation consequences" of pleading guilty. Id. At a post-conviction relief hearing, the defendant's counsel testified that he advised the defendant, "before he pled guilty, that he faced a substantial deportation risk." Id. The trial court granted the defendant's petition and vacated the conviction, and the Commonwealth of Pennsylvania appealed. See id.

In explaining that the defendant's counsel had not provided deficient representation because he had provided the defendant with correct advice about the immigration consequences of the plea, the Court stated:

> It is true that 8 U.S.C. § 1227(a)(2)(B)(i) does lead to the conclusion that [the defendant]'s [] conviction certainly made him *deportable*. However, whether the U.S. Attorney General and/or other personnel would necessarily take all the steps needed to institute and carry out [the defendant]'s actual deportation was not an absolute certainty when he pled. Given that [the defendant] did know that deportation was possible, given that counsel advised him there was a substantial risk of deportation, and given that counsel told [the defendant] it was likely there would be deportation proceedings instituted against him, we find counsel's advice was, in fact, correct.

Escobar, 70 A.3d at 841 (emphasis in original). The Court explained that, under its reading

- 42 -

of Padilla and the applicable immigration statute, counsel is not required to advise a defendant that "actual deportation proceedings are a certainty[.]" Escobar, 70 A.3d at 842. Rather, the Superior Court of Pennsylvania stated that, in Padilla, the Supreme Court held that counsel must simply inform the client about the risk of deportation attendant to a plea. See Escobar, 70 A.3d at 842. Because the defendant's counsel had, in fact, advised the defendant that the plea carried a risk of deportation and that deportation proceedings were likely, the Court concluded that the defendant's "counsel's advice was within the range of competence demanded of attorneys in criminal cases." Id.

In Facey v. State, 143 So. 3d 1003, 1003 (Fla. Dist. Ct. App. 2014) (*per curiam*), a District Court of Appeal of Florida held that the record in that case refuted the defendant's claims of ineffective assistance of counsel. In Facey, id., the defendant, a native of Jamaica who was a legal permanent resident, entered into a negotiated plea agreement for grand theft. The defendant signed a written plea form that advised him that the plea "'will' result in his deportation"; in the form, the defendant acknowledged that he had read and understood the plea form by initialing and signing it. Id. at 1004. At the plea proceeding, the trial court advised the defendant that entering a plea could subject him to "being deported" and that he "could be asked by the United States Immigration to leave the country permanently as a result of th[e] plea, or held by immigration, picked up by immigration and held by immigration[.]" Id. The defendant stated that he understood and affirmatively advised the trial court that he had spoken about the consequences with his counsel and did not desire to speak with anyone else about the immigration consequences of his plea. See id. The trial court confirmed with the defendant's counsel that the

defendant's counsel had discussed the immigration consequences with the defendant.  See id.  Later, the defendant filed a motion for postconviction relief, contending that his counsel had provided ineffective assistance by failing to advise him "about the possible adverse immigration consequences" of pleading guilty and failing to advise him to consult with an immigration lawyer.  Id. (citation and internal quotation marks omitted).  The trial court denied the motion, and the defendant appealed.  See id.

The District Court of Appeal of Florida concluded that the record expressly refuted the defendant's contention that his counsel had failed to tell him anything about the immigration consequences of pleading guilty, and instead demonstrated that the defendant "entered the plea aware of the possibility of deportation[.]"  Id.  The Court further observed that it was not "clear from the face of the [immigration] statute" "that the grand theft conviction . . . subject[ed] him to automatic deportation[.]"  Id. at 1005.  According to the Court, "*Padilla* does not require defense attorneys to provide perfect advice about immigration consequences."  Id.  Ultimately, the Court "decline[d] to extend *Padilla* to create an impractical requirement that criminal defense attorneys provide clients with perfect immigration advice."  Id.  Because the defendant "entered his plea with eyes wide open and aware of the risk of deportation[,]" he had to "face[] the very consequence that he fully acknowledged understanding when he accepted the plea."  Id.  See also People v. Arendtsz, 247 Cal.App.4th 613, 617, 616 (Cal. Ct. App. 2016) (A Court of Appeal of California held that a "[d]efendant was correctly advised of the immigration consequences of his nolo contendere plea as required by law" where, prior to the entry of the plea, the defendant's counsel twice advised the defendant that the plea would result in adverse

immigration consequences, and specifically stated that a conviction "will result in deportation[.]" (Emphasis omitted)); Neufville v. State, 13 A.3d 607, 614 (R.I. 2011) (The Supreme Court of Rhode Island stated that, under Padilla, 559 U.S. at 368, "[c]ounsel is not required to inform their clients that they *will* be deported, but rather that a defendant's 'plea would make the defendant eligible for deportation.'" (Emphasis in original) (brackets omitted)).

**Analysis**

Here, we hold that, where the coram nobis court found that trial counsel advised Sanmartin Prado that "this was a 'deportable offense' and [Sanmartin Prado] 'could be deported . . . if the federal government chose to initiate deportation proceedings,' and it was 'possible' that [Sanmartin Prado] would be deported[,]" and where trial counsel testified that he also advised Sanmartin Prado that "there could and probably would be immigration consequences" and "that it was a deportable or a possibly deportable offense," and the advice was given before the plea of not guilty by way of an agreed statement of facts proceeding, such advice was not constitutionally deficient, but rather was "correct advice" about the "risk of deportation," as required by Padilla, 559 U.S. at 369, 374.

As an practical matter, we first address whether pleading not guilty by way of an agreed statement of facts is the functional equivalent of pleading guilty for purposes of advisement of immigration consequences. In Taylor v. State, 388 Md. 385, 396-97, 879 A.2d 1074, 1081 (2005), this Court explained that proceeding by way of an agreed statement of facts is permissible, explaining the process as follows:

Under an agreed statement of facts both the State and the defense agree as to

the ultimate facts. Then the facts are not in dispute, and there can be, by definition, no factual conflict. The trier of fact is not called upon to determine the facts as the agreement is to the truth of the ultimate facts themselves. There is no fact-finding function left to perform. To render judgment, the court simply applies the law to the facts agreed upon[.]

(Citation and brackets omitted).[10] See also Bishop v. State, 417 Md. 1, 20, 7 A.3d 1074, 1085 (2010) (This Court described in detail the various types of pleas and described a plea of not guilty by way of an agreed statement of facts as a "hybrid plea" existing "[a]midst the spectrum between not guilty pleas and guilty pleas[.]"). In Sutton v. State, 289 Md. 359, 366, 424 A.2d 755, 759 (1981), this Court explained that "[t]rying a case on an agreed statement of facts ordinarily does not convert a not guilty plea into a guilty plea." In that case, however, we held that the defendant's plea of not guilty by way of an agreed statement of facts "was the functional equivalent of a guilty plea[,]" explaining:

[T]he totality of the circumstances, and in particular, the facts that the [defendant]'s plea was entered at the direction of the trial court and that she was aware that she would be placed on probation, shows that the proceeding was not in any sense a trial and offered no reasonable chance that there would be an acquittal.

Id. at 366, 424 A.2d at 759.

---

[10]Additionally, the Committee note to Maryland Rule 4-242(a) states:

It has become common in some courts for defendants to enter a plea of not guilty but, in lieu of a normal trial, to proceed on an agreed statement of ultimate fact to be read into the record or on a statement of proffered evidence to which the defendant stipulates, the purpose being to avoid the need for the formal presentation of evidence but to allow the defendant to argue the sufficiency of the agreed facts or evidence and to appeal from a judgment of conviction. That kind of procedure is permissible only if there is no material dispute in the statement of facts or evidence.

(Citations omitted).

Under the circumstances of this case, we conclude that Sanmartin Prado's plea of not guilty by way of an agreed statement of facts was the functional equivalent of pleading guilty for purposes of advisement of immigration consequences. To be sure, Sanmartin Prado did not enter, and was not convicted based on, a guilty plea, a conditional plea of guilty, or a plea of nolo contendere, as was the circumstance in Padilla, Denisyuk, and the other cases discussed above. Rather, Sanmartin Prado entered into a plea agreement under which he would proceed by way of a not guilty agreed statement of facts on the charge of second-degree child abuse, and, "[u]pon a finding of guilt," the State would recommend a sentence of ten years' imprisonment with all but one year suspended, and the State would nol pros the remaining charges for first-degree child abuse causing severe physical injury and second-degree assault. The State's recitation of the plea agreement made it clear that both parties expected that Sanmartin Prado would be convicted of second-degree child abuse based on the agreed statement of facts. During the waiver colloquy conducted by trial counsel, trial counsel explained that, by proceeding with a not guilty agreed statement of facts, Sanmartin Prado would be waiving his right to a jury trial as well as his right to "a Court trial or a bench trial[,]" "a formal contested trial in front of a judge." Sanmartin Prado affirmatively responded that he understood. Sanmartin Prado also affirmatively responded that he understood that he was waiving his right for trial counsel "to present a formal defense[.]" Sanmartin Prado did not reserve the right to appeal any matter associated with the not guilty agreed statement of facts plea. Nor did the not guilty agreed statement of facts suggest the existence of any factual or legal issues that were to be resolved by the circuit court. Under these circumstances, where a conviction was almost a

certainty given the State's recitation of the plea agreement and the waiver colloquy that followed, we conclude that Sanmartin Prado's plea of not guilty by way of an agreed statement of facts was the functional equivalent of a guilty plea; and, as such, the standards for advisement of immigration consequences during a guilty plea are applicable.

Having concluded as much, we now turn to whether trial counsel's advisement about the immigration consequences was constitutionally deficient because trial counsel "qualified" his advice, or whether the advice was correct advice that adequately informed Sanmartin Prado of the risk of deportation. We begin by closely examining the Supreme Court's holding in Padilla. As discussed above, in Padilla, 559 U.S. at 374, at bottom, the Supreme Court simply held "that counsel must inform [his or] her client whether his [or her] plea carries a risk of deportation." As to that holding, the Supreme Court instructed that, where "the deportation consequences of a particular plea are unclear or uncertain[,]" "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. at 369 (footnote omitted). On the other hand, where "the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear." Id.

Significantly, in Padilla, id. at 368-69, in considering the immigration consequences of Padilla's guilty plea in light of the relevant immigration statute, the Supreme Court never stated that Padilla would absolutely be deported or that deportation would occur with certainty. Rather, the Supreme Court stated that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction[,]" and that Padilla's "plea would make him eligible for deportation[.]" Id. at

368. The Supreme Court also determined that "[t]he consequences of Padilla's plea could easily be determined from reading the removal statute[,]" and that Padilla's "deportation was presumptively mandatory[.]" Id. at 369. When read in context, these remarks by the Supreme Court make clear that, in light of the relevant immigration statute—which provided that an alien convicted of a violation of any law related to a controlled substance other than a single offense involving possession for one's own use of thirty grams or less of marijuana is "deportable"—Padilla's conviction made him "deportable," nothing more and nothing less. Indeed, in Padilla, the Supreme Court did not state or require that defense counsel advise a noncitizen client "that deportation is an absolute certainty upon conviction of a deportable offense, including a controlled substance offense." Shata, 868 N.W.2d at 109 (citing Escobar, 70 A.3d at 841-42). Rather, defense counsel must advise of the risk of deportation and provide correct advice where the deportation consequence is clear. See Padilla, 559 U.S. at 374, 369.

To be sure, in Padilla, id. at 360, the Supreme Court stated: "We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him **subject to automatic deportation**." (Emphasis added). However, we agree with the Supreme Court of Wisconsin that, by stating that Padilla was "subject to automatic deportation," "the [Supreme] Court meant that Padilla was automatically deportable upon conviction, not that he would be automatically deported." Shata, 868 N.W.2d at 109-10. Indeed, in Padilla, 559 U.S. at 363-64, the Supreme Court explained that, although immigration law has undergone significant changes over the past decades and "if a noncitizen has committed a removable offense after the 1996 effective

- 49 -

date of the[] amendments, his [or her] removal is practically inevitable[,]" there still exists "the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses." (Footnote omitted). In other words, being "subject to automatic deportation" is not the equivalent of being automatically deported, because deportation is not an absolute certainty even if one is subject to automatic deportation. Moreover, in Shata, 868 N.W.2d at 110, the Supreme Court of Wisconsin aptly explained:

> The *Padilla* Court did not require that counsel advise that the [Department of Homeland Security] would necessarily initiate and prosecute a removal proceeding against Padilla and enforce a removal order against him because that was far from certain. Rather, the [Supreme] Court's "overall emphasis was that the deportation statute in question makes most drug convicts subject to deportation in the sense that they certainly become deportable, not in the sense that plea counsel should know and state with certainty that the federal government will, in fact, initiate deportation proceedings."

(Quoting Escobar, 70 A.3d at 842).

In short, nothing in the Supreme Court's holding in Padilla requires defense counsel to inform noncitizens that a conviction for a deportable offense will absolutely or with certainty result in the Federal government, *i.e.*, the Department of Homeland Security, initiating deportation proceedings. The Supreme Court did not discuss, let alone hold, that defense counsel must use specific magic words in advising of the risk of deportation, such as "absolute deportation, "certain deportation," or "inevitable deportation" or the like. As the Court of Appeals of Missouri remarked: "*Padilla* does not require that counsel use specific words to communicate to a defendant the consequences of entering a guilty plea. Rather, it requires that counsel *correctly* advise his [or her] client of the *risk* of deportation

- 50 -

so that the plea is knowing and voluntary." Chacon, 409 S.W.3d at 538 (emphasis in original). Nor did the Supreme Court hold that defense counsel must become experts in immigration law to provide representation to a noncitizen client at a guilty plea proceeding. The Supreme Court expressly recognized that "[i]mmigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it." Padilla, 559 U.S. at 369. Stated otherwise, the Supreme Court apparently acknowledged that the intricacies of immigration law are not necessarily something with which defense counsel are familiar or skilled. And, to that end, rather than holding that defense counsel must become experts in immigration law for purposes of advising noncitizen clients of the risks of deportation, in Padilla, id. at 366, the Supreme Court essentially extended the principle of Strickland that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (Quoting Strickland, 466 U.S. at 688). According to the Supreme Court, "[t]he weight of prevailing professional norms supports the view that counsel must advise [his or] her client regarding the risk of deportation." Padilla, 559 U.S. at 367 (citations omitted). Notably, in Padilla, the Supreme Court did not conclude that "prevailing professional norms" require defense counsel to inform noncitizen clients that convictions for deportable offenses will absolutely or with certainty lead to deportation. Instead, the Supreme Court stated that "[i]t is quintessentially the duty of counsel to provide [his or] her client with available advice about an issue like deportation and the failure to do so clearly satisfied the first prong of the Strickland analysis." Id. at 371 (citation and internal quotation marks omitted).

And, lest we forget to mention it, the Supreme Court decided Padilla, 559 U.S. at 359, against the backdrop, and in the context, of affirmative misadvice having been given. Padilla's counsel provided incorrect, erroneous advice by advising that Padilla "did not have to worry about immigration status since he had been in the country so long." Id. As the Supreme Court explained, "Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country." Id. at 368. Thus, it was "not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." Id. at 368-69.

By contrast, in this case, trial counsel provided correct immigration advice to Sanmartin Prado. The circuit court expressly credited trial counsel's testimony at the coram nobis hearing, that trial counsel met with Sanmartin Prado and explained the immigration consequences of a conviction, including that the offense was a "deportable offense," that Sanmartin Prado "could be deported . . . if the federal government chose to initiate deportation proceedings," and thus that it was "possible" that Sanmartin Prado would be deported. This advice—that second-degree child abuse is a deportable offense— was correct advice. See 8 U.S.C. § 1227(a)(2)(E)(i) ("Any alien who at any time after admission is convicted of a crime of . . . child abuse . . . is deportable.").[11] Thus, by advising

_____

[11]We need not address whether second-degree child abuse is also an aggravated felony under 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.") because both 8 U.S.C. § 1227(a)(2)(E)(i) or 8 U.S.C. § 1227(a)(2)(A)(iii) state that the offenses described by those subsections are "deportable."

Sanmartin Prado that the offense of second-degree child abuse was a deportable offense, trial counsel provided "correct advice" about the "risk of deportation[,]" as required by Padilla, 559 U.S. at 369, 374.  Nothing more was required of trial counsel under Padilla and his performance was not constitutionally deficient.  In our view, although the Supreme Court has not addressed the situation in which defense counsel advised a noncitizen defendant that an offense is "deportable" and that the defendant could be deported if the Federal government chose to initiate deportation proceedings, trial counsel's advice in this case fully complied with the Supreme Court's holding in Padilla.

Significantly, trial counsel's performance in this case is readily distinguishable from those cases in which a defendant's counsel's performance was constitutionally deficient due to a failure to advise the defendant whatsoever of the immigration consequences of the defendant's plea or affirmatively misadvising the defendant about the immigration consequences of the defendant's plea.  See, e.g., Denisyuk, 422 Md. at 482, 30 A.3d at 925 (The defendant's counsel "was obligated, but failed, to provide advice on the deportation consequences of [the defendant]'s plea, [and the defendant]'s trial counsel's performance was constitutionally deficient" where the defendant's counsel failed to advise the defendant of the immigration consequences of the plea altogether.); Bonilla, 637 F.3d at 984 (The defendant "received 'inadequate legal advice' about the immigration consequences of his plea" because he "received *no* advice about the immigration consequences before entering his plea, only learning afterward that pleading guilty would almost certainly result in deportation." (Emphasis in original) (citations omitted)); Akinsade, 686 F.3d at 250 (The defendant's counsel's performance was constitutionally deficient where he "misadvised

[the defendant] that he could not be deported based on th[e] single offense" and "that he could only be deported if he had two felony convictions."). Additionally, this case is distinguishable from Rodriguez-Vega, 797 F.3d at 787, in which the Ninth Circuit concluded that "counsel's statements made after [the defendant] had already pled guilty, that she faced a 'high likelihood' of removal, [do not] satisfy his duty to accurately advise his client of the removal consequences of a plea *before* she enters into it." (Emphasis in original) (citations omitted). By contrast, in this case, the circuit court expressly found as a fact that, prior to the January 6, 2011 proceeding, trial counsel met with Sanmartin Prado at the detention center and "explained the immigration consequences of a guilty verdict, including that this was a 'deportable offense' and [Sanmartin Prado] 'could be deported . . . if the federal government chose to initiate deportation proceedings,' and it was 'possible' that [Sanmartin Prado] would be deported." In other words, unlike in Rodriguez-Vega, in this case, trial counsel advised Sanmartin Prado **before** the plea of not guilty by way of an agreed statement of facts.

This case is also distinguishable from Favela, 311 P.3d at 1218, where New Mexico case law has developed to require that "criminal defense attorneys are obligated to determine the immigration status of their clients. If a client is a non-citizen, the attorney must advise that client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain." (Citing Paredez, 101 P.3d at 805). Indeed, New Mexico case law requires "a definite prediction as to the likelihood of deportation based on the crimes to which a defendant intends to plead and the crimes listed in federal law for which a defendant can be deported." Id. (citation and internal quotation

- 54 -

marks omitted).  In <u>Favela</u>, 311 P.3d at 1218, the Court of Appeals of New Mexico expressly recognized that <u>Padilla</u> "was not as broad on the issue of what constitutes deficient representation" in New Mexico, and that, in general, the New Mexico standard was a higher standard than that in <u>Padilla</u>.  For example, in New Mexico, an advisement "that a defendant 'could' or 'might' be deported is [] inadequate[.]"  <u>Favela</u>, 311 P.3d at 1218 (citation omitted).  By contrast, in Maryland, neither this Court nor the Court of Special Appeals has held that a defendant's counsel must advise of the "specific immigration consequences" attendant to a guilty plea, or that a defendant's counsel must advise "whether deportation would be virtually certain."  <u>Id.</u>  In other words, Maryland courts (with the exception of the Court of Special Appeals in this case) have not required advisements above and beyond what <u>Padilla</u>, 559 U.S. at 374, 369, requires—that a defendant's counsel advise his or her client whether a plea "carries a risk of deportation" and that such advice be "correct advice" where "the deportation consequence is truly clear" based on the relevant immigration law.

Rather, we conclude that the holdings of <u>Chacon</u>, <u>Shata</u>, and <u>Escobar</u> are more persuasive and analogous to the circumstances of this case.  In each of those cases, the courts held that the defendants' counsel advisements about the risk of deportation, even with the use of qualifying words, where such advice was correct advice, satisfied the dictates of <u>Padilla</u> and were not constitutionally deficient.  See <u>Chacon</u>, 409 S.W.3d at 534, 532 (The defendant's counsel's performance was not deficient where the defendant's counsel the defendant that "if he pled guilty to the charges, he would *very likely be deported and wouldn't be able to come back*" and advised the defendant to seek advice from an

immigration lawyer. (Emphasis in original) (internal quotation marks omitted)); Shata, 868 N.W.2d at 96 (The defendant's counsel "did not perform deficiently" where the defendant's counsel correctly advised the defendant that "his guilty plea carried a 'strong chance' of deportation."); Escobar, 70 A.3d at 841 (The defendant's counsel did not provide deficient representation where he gave correct advice about the immigration consequences of the plea, including that "there was a substantial risk of deportation" and that "it was likely there would be deportation proceedings instituted against [the defendant.]"). Moreover, in each of those cases, the courts recognized that a conviction for a deportable offense will not necessarily result in deportation, and that a defendant's counsel is not required to advise as much. See Chacon, 709 S.W.3d at 536-37 ("[The defendant] argues that, under *Padilla*, his attorney was required to specifically inform him that he was subject to 'mandatory deportation.' We disagree[.] . . . [The defendant]'s convictions made his deportation presumptively mandatory, and the motion court could properly find that advice that he 'would very likely be deported and wouldn't be able to come back,' did not fall below what is required of a reasonably competent attorney under the circumstances."); Shata, 868 N.W.2d at 114 ("We withdraw any language in [a prior case] that suggests that *Padilla* requires an attorney to advise an alien client that a conviction for a deportable offense will necessarily result in deportation."); Escobar, 70 A.3d at 842 ("We do not read the statute or the court's words [in *Padilla*] as announcing a guarantee that actual deportation proceedings are a certainty such that counsel must advise a defendant to that effect."). Ultimately, as in Chacon, Shata, and Escobar, in this case, Sanmartin Prado received similar and correct advice, namely, that "there could and

probably would be immigration consequences as a result of the plea[,]" that the offense "was a deportable or a possibly deportable offense[,]" and that Sanmartin Prado "could be deported . . . if the federal government chose to initiate deportation proceedings[.]"

As discussed, trial counsel's advice in this case was correct advice concerning the risk of deportation that Sanmartin Prado faced if convicted of second-degree child abuse. Trial counsel fully complied with the dictates of Padilla by advising Sanmartin Prado, prior to the January 6, 2011 proceeding, that "this was a 'deportable offense' and [Sanmartin Prado] 'could be deported . . . if the federal government chose to initiate deportation proceedings,' and it was 'possible' that [Sanmartin Prado] would be deported." Trial counsel did not fail to advise Sanmartin Prado altogether about the risk of deportation nor did trial counsel provide misadvice or false assurances along the lines of "you will not be deported"; *i.e.*, trial counsel in this case avoided providing no or incorrect advice. To be certain, advising Sanmartin Prado that the offense was "deportable" is not the equivalent of advising him that he will be automatically deported. But, as discussed above, Padilla does not require the use of specific magic words when advising a client of the risk of deportation, provided such advice is correct advice, nor does Padilla require that defense counsel advise a noncitizen client that a conviction for a deportable offense will absolutely, with certainty, or automatically, result in deportation. Importantly, the applicable immigration statute, 8 U.S.C. § 1227, does not state that the offenses are "automatically deportable" or that a noncitizen shall be "automatically deported"; rather, the statute provides that convictions for the offenses render noncitizens "deportable." Thus, contrary to Sanmartin Prado's contention, neither Padilla nor the statute requires that trial counsel

advise that deportation was automatic or mandatory.  And, in any event, that an offense is "deportable" does not mean that deportation is an absolute certainty.

As discussed above, in <u>Shata</u>, 868 N.W.2d at 108-09, the Supreme Court of Wisconsin explained why "deportation is not an absolutely certain consequence of a conviction for a deportable offense," stating:

> [W]hether immigration personnel would necessarily take all the steps needed to institute and carry out an alien's actual deportation is not an absolute certainty[.]   For example, prosecutorial discretion and the current administration's immigration policies provide possible avenues for deportable aliens to avoid deportation.  In fact, the executive branch has essentially unreviewable prosecutorial discretion with respect to commencing deportation proceedings, adjudicating cases, and executing removal orders.
>
> Indeed, the secretary of the United States Department of Homeland Security ("DHS") recently explained that the DHS, which is responsible for enforcing the nation's immigration laws, must exercise prosecutorial discretion in the enforcement of the law. Due to limited resources, DHS cannot respond to all immigration violations or remove all persons illegally in the United States.  DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding.  In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding whether to settle or dismiss a case and whether to grant deferred action or a stay of removal[.]  Deportation is not mandatory for a felony conviction. Rather, certain aliens, including those convicted of a felony, are generally prioritized for removal unless, based on the totality of the circumstances, the alien should not be an enforcement priority. Relevant factors include an alien's length of time in the United States and family or community ties in the United States.  **Because deportation is not an absolutely certain consequence of a conviction for a deportable offense,** *Padilla* **does not require an attorney to advise an alien client that deportation is an absolute certainty upon conviction of a deportable offense, including a controlled substance offense.**

(Emphasis added) (citations, brackets, ellipses, footnotes, and most internal quotation marks omitted).  Indeed, the process that must occur between a defendant's conviction for

a deportable offense and actual deportation makes it less than certain or absolute that deportation will actually result even if the defendant is convicted of a deportable offense.

Aside from the circumstance that deportation is not an absolute certainty upon conviction of a deportable offense, from a practical standpoint, it would be unreasonable to require defense counsel, without qualification, to advise noncitizen clients about the risk of deportation such that defense counsel is placed in the position of having to provide detailed and specific information about the risk of deportation and to essentially become an immigration law specialist. Even in Padilla, 559 U.S. at 369, the Supreme Court recognized that immigration law is a "complex" area of law and that there will "undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. Requiring defense counsel, who "may not be well versed in" immigration law, id., to become legal experts concerning immigration law places too high a burden on defense counsel, one that surely exceeds the "prevailing professional norms[,]" id. at 367. Moreover, it may not always be easy to tell whether a particular immigration statute is succinct, clear, and explicit. Indeed, even for those who are trained in immigration law, it may be difficult to ascertain whether a particular crime would be considered as a crime involving moral turpitude or as an aggravated felony. In short, it is unreasonable to require that defense counsel investigate and determine that the Federal government will, with certainty, actually deport a particular noncitizen defendant upon conviction of a deportable offense.

As to Maryland Rule 4-242(f)(1), we conclude that trial counsel's advice fully

complied with the Rule.[12]  Maryland Rule 4-242(f)(1) provides:

> Before the court accepts a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant [] **that by entering the plea, if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship**[.]

(Emphasis added).  Here, trial counsel's advice fully comported with Maryland Rule 4-242(f)(1), and indeed, by including the advisement that the offense of conviction was a deportable offense and that Sanmartin Prado could be deported if the Federal government chose to proceed, exceeded the requirements of the Rule.  Maryland Rule 4-242(f)(1) requires only that a defendant be advised that as a result of a guilty plea, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship. Maryland Rule 4-242(f)(1) does not require that any specific advice be given regarding the probability or certainty of deportation or that any specific information be given regarding any immigration law that may be applicable to a particular defendant's case.  In sum, Maryland Rule 4-242(f)(1) requires only that a noncitizen defendant be alerted that he or she may face immigration consequences.  The coram nobis court's findings support the conclusion that trial counsel complied with Maryland Rule 4-242(f)(1).  The coram nobis court specifically found that trial counsel advised Sanmartin Prado that the offense of conviction was a deportable offense and that he could be deported.  Additionally, the record

---

[12]By its plain language, Maryland Rule 4-242(f) is applicable only to "a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere[.]"  However, because we conclude above that Sanmartin Prado's plea of not guilty by way of an agreed statement of facts was the functional equivalent of a guilty plea, we shall address whether trial counsel's advice comported with Maryland Rule 4-242(f).

reflects that at the January 6, 2011 proceeding, following a colloquy with Sanmartin Prado concerning his immigration status, trial counsel stated: "And you understand that I'm not making any promises and the Judge is not making any promises about what the federal government could possibly do in the future with respect to reviewing this conviction." Sanmartin Prado stated that he understood. Together, the advisements prior to the January 6, 2011 proceeding and during the proceeding, indicate that Sanmartin Prado was made aware that he "may face additional [immigration] consequences[.]" In other words, trial counsel satisfied Maryland Rule 4-242(f)(1) in all its dictates.

As a related matter, we note that, by its plain language, contrary to Sanmartin Prado's assertion, Maryland Rule 4-242(f)(1) does not explicitly require that an advisement about additional immigration consequences must be made on the record at a plea proceeding. In distinct contrast, both Maryland Rule 4-242(c) (Plea of guilty) and Maryland Rule 4-242(e) (Plea of nolo contendere) expressly require that an "examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination therefor" occur so that the trial court can determine and announce on the record that the defendant is pleading voluntarily with the understanding of the nature of the charge and the consequences of the plea. Each of those subsections further states that, "before accepting the plea, the court shall comply with section (f) of this Rule." Neither Maryland Rule 4-242(c) or (e) provide, however, that compliance with Maryland Rule 4-242(f) can only be achieved by an on-the-record examination.

In any event, in this case, trial counsel advised Sanmartin Prado of the immigration

consequences for a conviction for second-degree child abuse both on and off the record in a manner that satisfied Maryland Rule 4-242(f)(1). The record of the January 6, 2011 proceeding demonstrates that trial counsel confirmed with Sanmartin Prado, on the record, that Sanmartin Prado was a legal permanent resident, *i.e.* a noncitizen, and that the two had engaged in discussions about Sanmartin Prado's immigration status. Sanmartin Prado also confirmed that he understood that neither trial counsel nor the circuit court were making any promises concerning what the Federal government would do in the future, as to immigration consequences, if Sanmartin Prado were convicted. Again, following the coram nobis hearing, the circuit court found "as a fact" that trial counsel met with Sanmartin Prado at the detention center prior to the January 6, 2011 proceeding, and that, at that time, trial counsel "explained the immigration consequences of a guilty verdict, including that this was a 'deportable offense' and [Sanmartin Prado] 'could be deported . . . if the federal government chose to initiate deportation proceedings[.]'" Under the circumstances of this case, we conclude that trial counsel's advisements satisfied Maryland Rule 4-242(f)(1).

In sum, we hold that trial counsel did not perform in a constitutionally deficient manner in advising Sanmartin Prado as to the immigration consequences attendant to a conviction for second-degree child abuse in the manner in which he did. Sanmartin Prado has failed to satisfy the first prong of Strickland, which requires that a "defendant must show that counsel's performance was deficient." Taylor, 428 Md. at 399, 51 A.3d at 662 (quoting Strickland, 466 U.S. at 687). Accordingly, Sanmartin Prado has not demonstrated

that he received ineffective assistance of counsel.[13]  As such, in the absence of constitutionally deficient performance by counsel—*i.e.*, in the absence of ineffective assistance of counsel being rendered by trial counsel—we conclude that the circuit court correctly denied Sanmartin Prado's petition for coram nobis relief.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  RESPONDENT TO PAY COSTS.**

---

[13]Having concluded that Sanmartin Prado failed to satisfy the first prong of the Strickland test, we need not address the second prong of Strickland, concerning prejudice.